IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 08-00098-01-CR-W-FJG |
| SAMUEL BROOKS, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION TO GRANT
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence seized from his residence on the ground that police had no warrant to search his residence and no exception to the warrant requirement existed. I find that no recognized exception to the search warrant requirement exists, and as a result the search of defendant's residence was unconstitutional. Therefore, defendant's motion to suppress evidence should be granted.

*I. BACKGROUND*

On April 14, 2008, an indictment was returned charging defendant with one count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On August 28, 2008, defendant filed a motion to suppress evidence, arguing that there was no warrant to search the residence and no exception applied (document number 32). On September 19, 2008, the government filed a response arguing that the officers discovered the handgun a mere 20

minutes after arriving on the scene, and they believed they were processing an attempted suicide scene and not a crime scene (document number 35).

On October 23, 2008,[1] I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Paul Becker. The defendant was present, represented by Richard Jacoby. The following witnesses testified:

1. Detective John Gale, Blue Springs, Missouri, Police Department

2. Lieutenant Steve Decker,[2] Blue Springs, Missouri, Police Department

In addition, the following exhibits were marked and admitted into evidence:

    P. Ex. 1  Photograph of defendant's family room

    P. Ex. 2  Photograph of defendant's family room

    P. Ex. 3  Photograph of defendant's family room

    P. Ex. 4  Photograph of doorway leading to laundry room

    P. Ex. 5  Photograph of laundry room

    P. Ex. 6  Photograph of inside of washing machine

    P. Ex. 7  Photograph of inside of washing machine

---

[1] Defendant's motion for judicial determination of mental competency was not resolved until October 3, 2008; therefore, the hearing was not set until defendant was found competent to proceed.

[2] Lieutenant Decker was a sergeant at the time of this incident (Tr. at 13).

2

P. Ex. 8   Investigation Report of C. Yeager dated February
           16, 2008

P. Ex. 9   Investigation Report of Kevin Lange dated February
           16, 2008

P. Ex. 10  Crime scene log

D. Ex. 1   Group of 163 photographs taken of various rooms
           and closets in defendant's residence

## *II.  EVIDENCE*

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.  At approximately 8:09 p.m. on February 16, 2008, Detective John Gale, who was filling in on patrol, received a call to respond to 607 SW Pinebrook Village in Blue Springs (Tr. at 5).  He was told that someone had appeared at the door of this residence, shot an individual inside, and then left (Tr. at 7). It took Detective Gale three minutes to arrive (Tr. at 6). Detective Gale arrived right after Officer Spencer had arrived (Tr. at 6).

2.  The residence at 607 SW Pinebrook Village is a two-story duplex on a cul-de-sac (Tr. at 7, 16).  When the police arrived, the front door was open and once at the door, they could see the shooting victim on the floor being attended to by defendant, the victim's brother (Tr. at 7).  The victim had a wound in his chest or abdomen area, but he was able to speak (Tr. at 8).

3

3. Detective Gale and Officer Unruh checked the interior of the duplex, including the upstairs, to make sure no one else was inside (Tr. at 8-9). They found no one other than the victim and defendant in the residence (Tr. at 9). On the main floor, there was a living area with a laundry room at the back and a garage to the right (Tr. at 9).

4. Once the residence was cleared, Detective Gale re-entered the family room area on the main level and asked Officer Spencer about any suspect information, but there was none (Tr. at 9). Detective Gale asked the victim whether he could say if the shooter was male, female, white, black, or anything about the person, and the victim said he could not (Tr. at 9).

5. When the medics arrived, defendant was taken into the garage by Detective Gale and Officer Yeager because he was very emotional and very agitated (Tr. at 10). Officer Yeager tried to ask defendant questions to get personal information for the report and to get defendant's observations of what had happened (Tr. at 10). However, defendant was highly agitated, did not want to answer any questions, asked several times to ride with his brother in the ambulance, and tried to charge past the officers back into the living area (Tr. at 10). At that point, defendant was taken into custody for obstructing a police operation (Tr. at 11). Defendant was handcuffed and Officer Spencer transported him to the police station (Tr. at 11).

4

6. Sometime after defendant was taken from the scene, his father arrived (Tr. at 11). Defendant's father asked Detective Gale if defendant had shot his brother (Tr. at 11). Detective Gale was directed to go to the hospital to talk to the victim, so Sergeant Rapp talked to defendant's father (Tr. at 11). By the time Detective Gale left the residence, defendant had been taken to the police station and his brother had been taken to the hospital (Tr. at 11).

7. During the hearing Detective Gale was asked what was going on at the residence when he left: "When I left, Sergeant Decker and Detective Lange had arrived and they were going to be doing the investigation at the scene there. And so, they were trying to formulate their game plan as to what was going on. They had talked to Sergeant Rapp and gotten a briefing from him." (Tr. at 12). According to the log sheet (P. Ex. 10), Detective Gale arrived at 8:12 p.m. and left the scene at 9:00 p.m. (Tr. at 12).

8. All of the pictures were taken after Detective Gale left the residence (Tr. at 12-13). By the time Sergeant Decker and Officer Lange arrived, defendant and his brother had been taken from the scene (Tr. at 13, 17). Officer Spencer had already done a security sweep of the downstairs area (Tr. at 13). There was evidence tape around the residence (Tr. at 13). When Lange and Decker arrived, the scene was secure (Tr. at 13, 23).

5

9. Detective Lange, the on-call detective, had telephoned Sergeant Decker at his home and informed Sergeant Decker that there had been a shooting (Tr. at 15). Sergeant Decker received the call at about 8:30 p.m. and he arrived at the scene about eight minutes later "to process a crime scene" (Tr. at 16, 22; P. Ex. 10). It was raining, and Sergeant Decker parked about a half a block away due to the marked units parked in front of the residence (Tr. at 16). As he approached the residence, he saw that the front door was open and there were officers at the front door (Tr. at 16).

10. Sergeant Decker located Sergeant Rapp who reported that the victim had been shot by an unknown assailant from the front door while the victim stood in the doorway of the laundry room (Tr. at 17). Sergeant Decker walked over to the entry way to the laundry room since that is where the victim had been shot (Tr. at 18). He observed one spent casing and two live rounds lying on the floor near the laundry room (Tr. at 18, 24). Sergeant Decker backed into the laundry room facing the front door trying to determine what had occurred (Tr. at 19). Sergeant Decker did not believe the story that had been told by the occupants because of the ammunition on the floor near the laundry room (Tr. at 19). He was trying to figure out whether the shooter could have been at the door based on the trajectory of the casing and where the victim had reportedly been standing (Tr. at 19).

6

11.  While Sergeant Decker was standing in the laundry room trying to determine what had happened based on the evidence, he observed a knife lying on the corner of the washer (Tr. at 20). Officer Yeager said she had placed the knife there (Tr. at 20). Sergeant Decker then saw the butt of a gun sticking out from clothing inside the washing machine (Tr. at 20).  He discovered this gun about ten or 15 minutes after he had arrived (Tr. at 20).  He instructed Detective Lange to photograph and seize the gun (Tr. at 21).

12.  At the time the gun was discovered, the scene was secure, and no civilians could wander in or come and go as they pleased (Tr. at 21).  Sergeant Decker did not consider getting a search warrant because "we were still in that first assessing of what had occurred and based upon the story that had been given to the officers, I still didn't think that we were to that point." (Tr. at 21).

13.  The 163 photographs were taken while the crime scene was being processed and after defendant and his brother had been removed from the residence (Tr. at 22).

### *III. SEARCH OF RESIDENCE*

Defendant argues that the police had no authority to search the residence as there was no warrant and no exception to the search warrant requirement existed.  The government, in attempting to distinguish <u>Thompson v. Louisiana</u>, 469 U.S. 17

7

(1984), does precisely what the Court rejected in that case -- it attempts to establish a murder or crime scene exception to the warrant requirement solely by pointing out that it didn't take very long for the officers to find the incriminating evidence.

There are two cases that are entirely on point here. I will quote extensively from both of them, as there is no way to distinguish either of these cases from the facts at bar.

In Mincey v. Arizona, 437 U.S. 385 (1978), the Supreme Court rejected a murder-scene exception to the search warrant requirement. In that case, officers arrived at the defendant's apartment and during the ensuing attempt to arrest the occupants, an undercover police officer was shot (and later died) and several other individuals present were shot as well. After all of the shooting victims were removed from the residence, homicide detectives arrived and, over a four-day period, thoroughly searched and photographed the residence.

> "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions. . . .
>
> We do not question the right of the police to respond to emergency situations. . . . [T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an

8

exigency or emergency." And the police may seize any
evidence that is in plain view during the course of their
legitimate emergency activities. . . .

But a warrantless search must be "strictly circumscribed by
the exigencies which justify its initiation." . . . All the
persons in Mincey's apartment had been located before the
investigating homicide officers arrived there and began
their search. . . .

Except for the fact that the offense under investigation was
a homicide, there were no exigent circumstances in this
case. . . . There was no indication that evidence would be
lost, destroyed, or removed during the time required to
obtain a search warrant. . . . And there is no suggestion
that a search warrant could not easily and conveniently have
been obtained. We decline to hold that the seriousness of
the offense under investigation itself creates exigent
circumstances of the kind that under the Fourth Amendment
justify a warrantless search. . . .

"The point of the Fourth Amendment, which often is not
grasped by zealous officers, is not that it denies law
enforcement the support of the usual inferences which
reasonable men draw from evidence. Its protection consists
in requiring that those inferences be drawn by a neutral and
detached magistrate instead of being judged by the officer
engaged in the often competitive enterprise of ferreting out
crime." . . .

In sum, we hold that the "murder scene exception" created by
the Arizona Supreme Court is inconsistent with the Fourth
and Fourteenth Amendments -- that the warrantless search of
Mincey's apartment was not constitutionally permissible
simply because a homicide had recently occurred there.

Mincey v. Arizona, 437 U.S. at 390-395 (citations omitted).

Six years later, the Supreme Court was faced with the same circumstances except that instead of police searching the residence for four days after the shooting, they searched only for two hours. The Supreme Court held that time was not the

relevant factor -- that there simply is no crime scene exception to the search warrant requirement.

In Thompson v. Louisiana, 469 U.S. 17 (1984), the defendant shot and killed her husband and then attempted to commit suicide by taking pills. After consuming the pills, the defendant changed her mind and told her daughter to call for help. The daughter called the police who arrived and were let into the residence by the daughter. The defendant, who was by then unconscious, was taken by ambulance to a hospital. Thirty-five minutes later, homicide detectives arrived and conducted a general exploratory search, examining each room of the house, for approximately two hours. The Court rejected the government's attempt to distinguish the facts of this case from the facts of Mincey:

> Although the homicide investigators in this case may well have had probable cause to search the premises, it is undisputed that they did not obtain a warrant. Therefore, for the search to be valid, it must fall within one of the narrow and specifically delineated exceptions to the warrant requirement. In Mincey v. Arizona, we unanimously rejected the contention that one of the exceptions to the Warrant Clause is a "murder scene exception." Although we noted that police may make warrantless entries on premises where "they reasonably believe that a person within is in need of immediate aid," and that "they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises," we held that "the 'murder scene exception' . . . is inconsistent with the Fourth and Fourteenth Amendments -- that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there." Mincey is squarely on point in the instant case.

> . . . [N]othing in Mincey turned on the length of time
> taken in the search or the date on which it was conducted.
> A 2-hour general search remains a significant intrusion on
> petitioner's privacy and therefore may only be conducted
> subject to the constraints -- including the warrant
> requirement -- of the Fourth Amendment. . . .
>
> Petitioner's attempt to get medical assistance does not
> evidence a diminished expectation of privacy on her part.
> To be sure, this action would have justified the authorities
> in seizing evidence under the plain-view doctrine while they
> were in petitioner's house to offer her assistance. In
> addition, the same doctrine may justify seizure of evidence
> obtained in the limited "victim-or-suspect" search discussed
> in Mincey. However, the evidence at issue here was not
> discovered in plain view while the police were assisting
> petitioner to the hospital, nor was it discovered during the
> "victim-or-suspect" search that had been completed by the
> time the homicide investigators arrived. Petitioner's call
> for help can hardly be seen as an invitation to the general
> public that would have converted her home into the sort of
> public place for which no warrant to search would be
> necessary. Therefore, the Louisiana Supreme Court's
> diminished-expectation-of-privacy argument fails to
> distinguish this case from Mincey.

Thompson v. Louisiana, 469 U.S. at 20-22 (citations omitted).

It is clear from the above Supreme Court cases that there is no crime-scene exception to the search warrant requirement. The facts of this case are indistinguishable from the relevant facts of the above cases wherein it was held that a search warrant was required. In all cases, there was a shooting and someone was in urgent need of medical attention. In Thompson as well as this case, the eventual defendant is the person who summoned the police to the residence for help. In all cases, the injured parties and the suspects had been removed from the residence before the investigating officers arrived. In all cases, the

11

incriminating evidence was not found in plain view during the security sweep of the residence. And in all cases, there was no reasonable excuse for the failure to obtain a search warrant.

The government's argument that the search in this case did not last as long as the two-hour search in <u>Thompson</u> is not persuasive. Such a rule would encourage police to conduct warrantless searches in the hopes that incriminating evidence would be discovered quickly. The officers' belief that they were not searching for evidence of a crime but rather evidence of a suicide is neither a recognized exception to the warrant requirement nor plausible in light of the evidence presented at the hearing. The evidence was that defendant reported he was upstairs when he heard a popping sound and he ran downstairs to find his brother shot. The victim claimed that he had been shot by an intruder.

The government identifies no recognized exception for this warrantless search. It merely attempts, unsuccessfully, to distinguish the facts of this case from those of the above-quoted cases. The government bears the burden of establishing that an exception to the search warrant requirement exists. <u>United States v. Guzman</u>, 507 F.3d 681, 687 (8th Cir. 2007). The government has not met this burden.

12

## IV. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in section III, I conclude that no recognized exception to the search warrant requirement exists, and therefore the search of defendant's residence was unconstitutional. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order granting defendant's motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 3, 2008